NOTICE
Decision filed 05/17/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 200388-U

NOS. 5-20-0388, 5-20-0389 cons.

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| *In re* K.C. and C.C., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Madison County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | Nos. 17-JA-279 & 17-JA-280 |
| v. | ) | |
| | ) | |
| Dana G., | ) | Honorable |
| | ) | Martin J. Mengarelli, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE WELCH delivered the judgment of the court.
Justices Moore and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*: The circuit court's order terminating the parental rights of the respondent mother is affirmed where the State proved by clear and convincing evidence that she was unfit and where the court's best-interest finding was not against the manifest weight of the evidence.

¶ 2    The respondent, Dana G., appeals the order of the circuit court of Madison County terminating her parental rights to her minor children, K.C. and C.C. On appeal, she argues that the trial court's finding that she was an unfit parent under section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)) was erroneous because the State failed to prove her unfit by clear and convincing evidence. Additionally, she asserts that the court's finding

1

that termination of her parental rights was in the best interests of the children was against the manifest weight of the evidence. For the following reasons, we affirm.[1]

¶ 3                              I. BACKGROUND

¶ 4    The respondent is the mother of K.C., born June 9, 2005, and C.C., born July 9, 2008. Vincent C. is father to both children. This appeal involves only the termination of the respondent's parental rights to K.C. and C.C. However, facts relating to Vincent C. will be discussed as necessary to provide relevant background for the issues presented on appeal.

¶ 5    On December 11, 2017, the State filed a request for juvenile warrants for K.C. and C.C. pursuant to section 2-5(2) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-5(2) (West 2016)) where the children's circumstances of their home environment might endanger their health or welfare. The court entered a written order granting the petition and issued a warrant ordering that the children be immediately taken into custody of the Illinois Department of Children and Family Services (DCFS).

¶ 6    On December 12, 2017, the State filed two juvenile petitions simultaneously alleging that K.C. and C.C. were neglected minors under section 2-3(1)(a) of the Juvenile Court Act (*id.* § 2-3(1)(a)) where the respondent had a substance abuse addiction that impaired her ability to adequately care for the children; where the respondent did not have

---

[1]This is an accelerated appeal under Illinois Supreme Court Rule 311(a) (eff. July 1, 2018). With respect to such cases, Rule 311(a)(5) provides in relevant part that "[e]xcept for good cause shown, the appellate court shall issue its decision within 150 days after the filing of the notice of appeal." Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018). In this case, the 150-day period to issue a decision expired on April 30, 2021. Briefing in this appeal was not completed until March 31, 2021, and the case was submitted April 29, 2021. Under these circumstances, we find good cause to issue our decision after the 150-day deadline.

stable housing; where the respondent had a history of methamphetamine use, and the children had reported seeing the respondent hallucinating; and where Vincent C. failed to provide any care, support, or concern. It further alleged that K.C. and C.C. were neglected minors under section 2-3(1)(b) of the Juvenile Court Act (*id*. § 2-3(1)(b)) where the respondent had a substance abuse addiction that impaired her ability to care for the children; where the respondent had a history of methamphetamine use, and the children had reported seeing her hallucinate; where the respondent had attempted to adulterate a drug test that was requested by DCFS; where the respondent had mental health issues that were currently not being treated; where K.C. and C.C. reported that the respondent had hit K.C. with a belt, which left loop-shaped marks, and then threatened her not to tell anyone; where the children's family had a history with DCFS and the court; where Vincent C. had a criminal history including but not limited to obstruction of justice/destroying evidence, aggravated driving under the influence, and a pending charge for domestic battery; and where the respondent had a criminal history that included but was not limited to convictions for disorderly conduct and false reporting of an offense. It next alleged that K.C. and C.C. were abused minors under section 2-3(2)(i) of the Juvenile Court Act (*id*. § 2-3(2)(i)) where they reported that the respondent hit K.C. with a belt which left loop-shaped marks, and the respondent threatened her not to tell anyone. The State argued that it was in the best interest of the children that they be adjudged neglected minors and made wards of the court, and that a shelter care hearing be set on the matter.

¶ 7 The trial court entered a temporary custody order, finding probable cause to file the petitions. The court found there was an immediate and urgent necessity to remove the

3

children from the home and that leaving the children in the home would be contrary to their health, welfare, and safety. The court placed K.C. and C.C. in the temporary custody of DCFS.

¶ 8     On February 20, 2018, DCFS filed an initial family service plan for the respondent. It stated that, on November 16, 2017, DCFS received a report that she was abusing methamphetamine. Prior to the report being made, a family member had overdosed and reported that she had access to the drugs through the respondent. The respondent had a history of methamphetamine use, and this was the second report in six months regarding this allegation. The first report was deemed unfounded as the respondent had passed a urine drug screen. K.C. reported that early in the year she witnessed the respondent hallucinating and "thinking people were outside the home." The respondent completed a urine drug screen on November 17, 2017; however, the results came back "adulterated," indicating the respondent had altered the test. The respondent attended services at Centerstone, a community center that offered treatment services for mental health and addiction issues, but records indicated that she was discharged from their agency on June 2, 2017, and reported that she "struggled with keeping her appointments and regular attendance." Centerstone diagnosed her with post-traumatic stress disorder (PTSD) during her September 26, 2016, assessment. The records noted that she had a global assessment of functioning scale of 50, indicating she was seriously impaired by the symptoms of her disorder. Also during the assessment, the respondent reported that she had been sexually assaulted in 2014. She stated that she had attacked her assailant and "thought she killed him, but then saw him in the community."

¶ 9    The service plan further indicated that on June 14, 2017, a crisis assessment was completed, during which the respondent expressed that she was having thoughts of "not wanting to be here." Monique Phillips, an employee of Intact Family Services, met with the respondent on December 7, 2017. She observed that the respondent had open sores around her mouth that were bleeding; she was "fidgety and unable to keep still"; she did not understand why this "was happening to her"; she said that she was part of the "holy trinity, father, son, and holy ghost"; she questioned Phillips regarding her religion to ensure she was "part of the plan"; and she talked about "it all ending soon," continuing that "the world was ending soon." On December 8, 2017, Phillips met with the children. K.C. told her that a few days earlier, the respondent was "talking crazy" and speaking about "the holy trinity and the world ending."

¶ 10   The service plan recommended that the respondent be allowed supervised visitation with the children. The action steps indicated that the respondent needed to keep all appointments with DCFS and meet with the caseworker at least monthly; to keep the caseworker and the court informed of all changes of address, phone number, household composition, or employment within 24 hours; to cooperate with any court orders regarding services and visits; and to participate in the integrated assessment and follow any recommendations made therein.

¶ 11   On March 13, 2018, Caritas Family Solutions (Caritas) submitted its report to the trial court. It stated that after temporary custody was granted, K.C. and C.C. were placed in the home of relative foster parents, Riley M. and Gloria M., the children's maternal grandparents. The children were doing well in the placement at both home and school;

5

they were happy and felt loved and secure. K.C. was participating in counseling at school due to her grandparents suspecting some emotional issues. She had also received medical care, was participating in tutoring for math, and was making significant improvements. C.C. was attending tutoring four days a week, which helped with her grades. The grandparents were working toward licensure with DCFS, and there were no safety reasons to move the children. An integrated assessment was completed on February 21, 2018, but it had not yet been received by Caritas. It listed the following tasks for the respondent: (1) keep all appointments with DCFS and meet with caseworker at least monthly; (2) keep worker and the court informed of all changes of address, phone number, household composition, or employment within 24 hours; (3) cooperate with any court orders regarding services and visits; and (4) participate in the integrated assessment and follow any recommendations made in this assessment. The services provided were case management, referrals for appropriate services, visits in the home with foster parents and children, and crisis services as needed.

¶ 12 As to progress, the Caritas report stated that on February 7, 2018, the respondent participated in the integrated assessment and met with her caseworker on a monthly basis. On January 16, 2018, she participated in an assessment with Treatment Alternatives for Safe Communities (TASC), and Kyle Klobe was assigned as her TASC recovery coach. However, she completed two urine analysis screens, both of which were positive for cannabis. She was receiving mental health and substance abuse treatment through Centerstone, but her counselor reported that she had missed her last three appointments, and it was likely she would soon be given an unsatisfactory discharge from the program.

She participated in supervised parent child visits at Caritas that were one hour in length; however, she missed one visit due to her failure to call and confirm it in time. The report recommended the children remain in foster care until the services were completed, with the permanency goal that the children be returned home in 12 months.

¶ 13 The trial court entered an adjudicatory order finding that K.C. and C.C. were neglected as defined by section 2-3 of the Juvenile Court Act where the children suffered from a lack of support, education, and remedial care as defined by section 2-3(1)(a); and where they were in an environment injurious to their welfare as defined by section 2-3(1)(b). See *id.* §§ 2-3(1)(a), (1)(b). It further found that the children were abused where K.C. was physically abused as defined in section 2-3(2)(i) and where C.C. was in a substantial risk of physical abuse as defined in section 2-3(2)(ii). See *id.* §§ 2-3(2)(i), (2)(ii). This finding was based, in relevant part, on K.C.'s report that the respondent had hit her with a belt, leaving loop-shaped marks, and threatened her to not tell anyone. The remaining facts cited by the court mirrored the facts cited as probable cause in the temporary custody order. DCFS was ordered to prepare a report detailing the physical and mental histories of both children, the family situation, and any other relevant information it deemed appropriate.

¶ 14 The trial court entered a dispositional order, finding that, consistent with K.C. and C.C.'s health, welfare, and safety, it was in their best interest to be made wards of the court. This was based on the court's findings that "for reasons other than financial circumstances alone," the respondent was unfit to care for, protect, train, educate, supervise, or discipline her children and that placement with her would be contrary to their health, safety, and best

interests. It further noted that the respondent had not yet successfully completed all service plan tasks and that the conditions that initially brought the children into care had not been corrected. The children were adjudicated neglected and abused and placed in the custody of DCFS, and any visitation was to be supervised.

¶ 15 On June 19, 2018, DCFS filed a family service plan dated May 25, 2018. It indicated that the respondent had completed the integrated assessment, engaged in services, participated in regular visits with the children, and cooperated with DCFS. The respondent reported that she had been arrested on July 11, 2017, for retail theft under $150 and was placed on probation. She was currently unemployed but had settled a lawsuit with Domino's Pizza for $150,000 after she was hit by one of their delivery drivers.

¶ 16 With regards to the respondent's mental health, the service plan indicated that she appeared to have significant maladaptive interpersonal traits that were associated with her reactions to the long-term trauma she suffered. She was suspected of having long-term difficulties with depression. Her history included periods of psychosis. She had difficulty making changes in her life. She reported extensive symptoms of PTSD. She had a history of chronic substance abuse starting when she was an adolescent. She was irritable and brusque during the interview. She presented with a disconnection to her emotions associated with past traumas. Her traumatic or adverse experiences increased her trauma reactive responses, which resulted in chronic interpersonal difficulties and problems with fulfilling responsibilities, including making safe parenting decisions. She was seeing a counselor at Centerstone as part of her probation but had gone from attending weekly to only twice a month. She reported that her coping strategy was to "just keep going."

¶ 17    The service plan reported that K.C. felt sad about the respondent's choices, and mad that she could not trust the respondent as the respondent was more concerned with herself than the children.  K.C. also appeared to be suffering from PTSD that resulted from enduring ongoing trauma and living in a chaotic, violent, and emotionally abusive home for years.  In 2017, she was diagnosed with anxiety and attended a counseling group at her school on Tuesdays.  C.C. indicated that with regards to her own mental health, she was "fine."  However, her caregiver reported that she sometimes got upset when the respondent would call the house.  She did, however, appear to have a positive attachment with her sister.  She presented with trauma reactive symptoms and posttraumatic symptoms, which impacted her functioning at school as she continued to struggle academically.  She was also diagnosed with anxiety in 2017.

¶ 18    The service plan identified the following action steps for C.C.: (1) undergo trauma-informed psychotherapy; (2) participate in all medical, emotional, and educational appointments and services; (3) maintain positive behavior at home and school; (4) attend family therapy to aid with reunification; and (5) inform her caregivers of any extracurricular activities or hobbies that she had an interest in so she may be enrolled in the program.  She was rated satisfactory progress for all services.

¶ 19    For K.C., the following action steps were identified: (1) inform her caregivers of any extracurricular activities or hobbies that she had an interest in so she may be enrolled in the program; (2) attend family therapy to aid with reunification; (3) participate in all medical, emotional, and educational appointments and services; (4) receive education regarding parental mental illness, domestic violence, and substance abuse; (5) maintain

9

positive behavior at home and school; and (6) undergo trauma-informed assessment and psychotherapy. She was assessed achieved for education regarding parental mental illness, domestic violence, and substance abuse, and satisfactory for all other services.

¶ 20 The following action steps were identified for the respondent: (1) complete individual and trauma-informed therapy; (2) attend family therapy with K.C. and C.C. when deemed appropriate; (3) cooperate with Centerstone for completion of mental health assessment and treatment; (4) cooperate with TASC for completion of substance abuse assessments, recovery, and random drug drops; (5) cooperate with Centerstone for completion of substance abuse assessments, recovery, and random drug drops; (6) complete a psychological evaluation if deemed appropriate by the DCFS consulting psychologist, and comply with any recommendations; (7) attend parenting education and comply with any recommendations; (8) cooperate with any court orders regarding services and visits; (9) keep all appointments with DCFS and meet with caseworker at least monthly; (10) keep worker and court informed of all changes of address, phone number, household composition, or employment within 24 hours; (11) participate in a psychiatric evaluation and comply with any additional recommended services; (12) complete an integrated assessment and comply with any recommendations; (13) demonstrate appropriate parenting skills during visitation; (14) cooperate with DCFS or any other authorized visitation monitors who are supervising visits; (15) attend and participate in all scheduled visits with K.C. and C.C.; (16) provide a copy of a lease for any address where she resides; (17) disclose any roommate/other individuals who may also reside with her and be willing to provide their information for a background check; (18) find safe, stable

housing that is appropriate for herself, K.C., and C.C.; (19) provide her current address within 24 hours when and if it changes; and (20) develop a healthy support system that includes resources and support people.

¶ 21 The respondent was assessed unsatisfactory progress for the following tasks: cooperate with TASC in the completion of substance abuse assessments, recovery, and random drug drops; cooperate with Centerstone for completion of substance abuse assessments, recovery, and random drug drops; complete a psychological evaluation if deemed appropriate by the DCFS consulting psychologist, and subsequent compliance with any recommendations provided from the evaluation; complete a psychiatric evaluation and comply with any additional recommended services; provide a copy of a lease for any address where she resides; disclose any roommate/other individuals who may also reside with her and provide their information for a background check; find safe, stable housing that is appropriate for herself, K.C., and C.C.; and develop a healthy support system that includes resources and support people. On all other tasks and services, she was assessed as making satisfactory progress.

¶ 22 Caritas filed a permanency hearing report with the trial court. The report first noted that DCFS became involved due to an allegation of substantial risk of physical injury/environment injurious to the health and welfare of the children by neglect. It indicated that the respondent made satisfactory progress on the integrated assessment, individual trauma-informed therapy, parenting education, cooperation with DCFS and the court, and parent child visitation. The respondent made unsatisfactory progress in completing a TASC mental health/substance abuse assessment, treatment, and random

11

drug drops; completing a psychiatric evaluation and services; providing a safe, stable home environment; and developing a healthy support system. With regard to visitation, the respondent had been allowed two hours of supervised visitation per week and had attended 19 out of 22 visits. She arrived on time, was focused, demonstrated appropriate parenting skills, made progress on maintaining appropriate language and topics of conversation, and improved during the reporting period. She was also cooperative with DCFS monitors during the visits. The report recommended a permanency goal of return home in 12 months and unsupervised visits for the respondent.

¶ 23    On July 19, 2018, the trial court entered an initial permanency order. It found the appropriate permanency goal to be return home in 12 months, if the parent has made substantial progress. It further determined that the respondent had not made reasonable and substantial progress, or reasonable efforts, towards returning the children home, and had not completed all service plan tasks. Therefore, the children were ordered to remain in DCFS custody.

¶ 24    On September 18, 2018, Caritas filed a permanency hearing report with the trial court. It indicated the same findings as the June report. It further stated that the respondent was incarcerated in July 2018 on unlawful possession of methamphetamine charges. It recommended supervised visitation due to inconsistency in services, and that the children remain in the custody of DCFS. The recommended permanency goal was return home in 12 months. The case was called but was continued because the respondent had hired private counsel who failed to enter an appearance.

¶ 25    On January 8, 2019, Caritas filed another permanency hearing report.  The respondent was assessed as making satisfactory progress in the integrated assessment, cooperating with DCFS and the trial court, and parent child visitation.  She was now rated unsatisfactory in the other services and tasks including individual trauma-informed therapy and parenting education.  It recommended supervised visitation and that custody of the children remain with DCFS.  The case was once again continued.

¶ 26    On March 5, 2019, Caritas filed another permanency hearing report.  It made the same findings regarding the respondent's progress of tasks and services.  The report further indicated that the respondent remained inconsistent with her involvement in services.  There were also "alarming safety concerns" with her choices and mental health.  There was concern that she did not contemplate the consequence of jeopardizing K.C. or C.C.'s safety in unsafe environments or with unsafe peers.  It recommended continued supervised visitation and that custody of the children remain with DCFS.

¶ 27    Attached to the Caritas report was a DCFS family service plan dated January 29, 2019.  It identified the same action steps and progress statuses for both K.C. and C.C.  As to the respondent, she had made unsatisfactory progress in parenting education; psychiatric evaluation and compliance with any additional recommended services; providing a copy of the lease where she resides; providing safe, stable housing appropriate for herself and the children; cooperating with Centerstone for completion of substance abuse assessments, recovery, and random drug drops; cooperating with TASC for completion of substance abuse assessments, recovery, and random drug drops; demonstrating appropriate parenting skills during visitation; developing a healthy support system that includes resources and

13

support persons; psychological evaluation if deemed appropriate by the DCFS consulting psychologist and compliance with any recommendations; and completing background checks on any individual in the respondent's support system who may have a caretaking role of K.C. and C.C. She had completed the integrated assessment on February 7, 2018. She had made satisfactory progress in family therapy with K.C. and C.C.; individual and trauma-informed therapy; keeping DCFS and the court informed of all changes to address, phone number, household composition, or employment within 24 hours; cooperating with court orders regarding services and visits; keeping all appointments with DCFS and meeting with her caseworker at least monthly; having no other roommates/individuals residing in the home, and providing information of frequent visitors for background checks; providing current address within 24 hours if and when it changes; cooperating with Centerstone in completing a mental health assessment and treatment; attending and participating in all scheduled visits with K.C. and C.C.; and cooperating with DCFS or any other authorized visitation monitors who supervise visits.

¶ 28    The following action steps were added to her service plan: (1) complete parenting education by March 5, 2019; (2) take responsibility for her actions, decisions, and progression within the case; (3) complete lab work by March 5, 2019, in order to engage in services recommended in her psychiatric evaluation; (4) demonstrate progress on the issue of mental health by developing an understanding of its effects on parenting and relationships; (5) through treatment, understand that the children need her as a parent and the type of protection a parent should provide, and understand that lack of engagement in mental health/psychiatric care is a large safety concern for the children; (6) remain

14

compliant, engaged, and participate regularly with service provider scheduled sessions due to prior domestic violence history; (7) maintain an adequate living arrangement including an acceptable level of cleanliness and payment of bills on time; (8) comply with any additional services recommended by her substance abuse provider; (9) participate in weekly random urine testing requested by the agency; (10) stop the use of all alcohol/nonprescribed medication/substances as reported by the agency, law enforcement, or other involved individuals; (11) demonstrate progress in substance abuse by developing an understanding of the recovery process, triggers, effects of addiction on oneself and children, and develop a relapse plan; (12) understand that failure to appear for a drug drop will be considered positive for substances and refrain from substance abuse consumption for four months, and then continually for progression in the case; (13) agree that visits will be terminated if she appears under the influence; (14) refrain from discussing the case and court issues during visitation with K.C. and C.C.; (15) identify toxic relationships of those who jeopardize her sobriety, safety, and well-being in order to eliminate those relationships; (16) sign consents to obtain records from her domestic violence evaluation/counseling; (17) participate in a parent abuse evaluation and complete domestic violence counseling; and (18) remain free from incidents of domestic violence.

¶ 29    As to all action steps, the respondent was required to cancel or reschedule appointments for services 24 hours prior to the appointment, or 4 hours prior in case of emergency, to avoid a "no show" listed in her participation.  The case was called but was continued because the respondent's counsel filed a motion for leave to withdraw, which was subsequently granted.

15

¶ 30    On April 4, 2019, Caritas filed a permanency hearing report.  It indicated that the respondent had made unsatisfactory progress in her individual and trauma-informed therapy as her participation was inconsistent.  Her progress was unsatisfactory in her mental health/substance abuse assessment, treatment, and random drug tests where she tested positive for amphetamines in March 2018, methamphetamine in August 2018, and marijuana in January 2019; her participation in her treatment was also inconsistent.  Her progress was unsatisfactory in getting a psychiatric evaluation and services where her labs were not on file.  Her progress was unsatisfactory in maintaining a safe, stable home environment as her residence did not meet minimum DCFS standards.  She was also unsatisfactory in developing a healthy support system and completing domestic violence services.

¶ 31    The respondent had made satisfactory progress in parenting education, cooperating with DCFS and the court, parent child visitation, and completion of the integrated assessment.  However, the report found that, overall, the respondent's inconsistency in participating in services meant that the conditions to ensure safe permanency for the children could not be achieved. The report also included the same alarming safety concerns noted in the previous report.  The report recommended that visitation remain supervised, and custody of the children remain with DCFS.  The trial court entered a permanency order with the goal of returning the children home within 12 months.

¶ 32    On July 25, 2019, Caritas filed another permanency hearing report.  It contained the same progress ratings as the previous report.  It once again noted the respondent's inconsistency in participating in services.  The recommended permanency goal was

16

changed to substitute care pending the trial court's determination on termination of parental rights as there was insignificant progress throughout the case in working towards the goal of returning the children home. Since May 2019, the worker had minimal contact with the respondent. Additionally, the respondent continued to fail to take responsibility for the conditions that brought the children into care. The case was called but was continued because the respondent was appointed new counsel that morning.

¶ 33 On August 27, 2019, Caritas filed a permanency hearing report. The respondent was deemed to have made unsatisfactory progress in individual and trauma-informed therapy; mental health/substance abuse assessment, treatment, and random drug drops; cooperating with DCFS and the trial court; psychiatric evaluation and services; providing a safe, stable home environment; developing a healthy support system; and completing domestic violence services. She was satisfactory in completing the integrated assessment, parenting education, and parent child visitation. The reasoning was substantively the same as the previous report. The report once again recommended substitute care pending the court's determination on termination of parental rights.

¶ 34 That day, Vincent C. signed and filed a final irrevocable consent to adoption. Specifically, he consented to the adoptions of K.C. and C.C. by Keith and Kristie M., the children's maternal uncle and his wife, with whom the children had been placed since February 2019. The court entered a subsequent permanency order finding the appropriate permanency goal to be substitute care pending determination of termination of parental rights as the respondent had not made reasonable efforts towards returning the children

17

home where she had not yet completed all service plan tasks. It further ordered that the children remain in the custody of DCFS.

¶ 35 On October 8, 2019, Caritas filed a permanency/best-interest report with the trial court. The findings as to the respondent's progress were the same as the previous report. The recommended goal was termination of parental rights as there was insignificant progress made towards the return home goal. As to the best interests of K.C. and C.C., the report indicated that the children had been living in Keith and Kristie M.'s home since February 2019. Both children were bonded to them and looked to them to have all of their needs met. It was observed that the children were comfortable in the home, showed no fear of Keith or Kristie M., and there were no safety concerns with the children in this placement. The children were taken to doctor's appointments as needed, including counseling, and Keith and Kristie M. were willing to meet any special needs that might arise. The report noted that since September 2019, after the permanency goal was changed to substitute care pending determination of termination of parental rights, the children had monthly contact with the respondent. The report recommended that the children remain in the custody of DCFS and that the court terminate the respondent's parental rights to allow permanency for the children through adoption.

¶ 36 The State filed a petition for termination of parental rights and for appointment of a guardian with power to consent to adoption. The State argued that the respondent was unfit pursuant to section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)) where she failed to make reasonable efforts to correct the conditions that were the basis for the removal of the children during any nine-month period following the adjudication of neglect

18

or abuse; failed to make reasonable progress toward the return of the children during any nine-month period following the adjudication of neglect or abuse; and failed to maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare. Furthermore, it was in the children's best interest and welfare that the respondent's parental rights be permanently terminated, and that the children be placed in the guardianship of the DCFS, with the power to consent to adoption.

¶ 37 On April 14, 2020, the trial court continued the hearing on the State's petition in response to the Covid-19 medical crisis.

¶ 38 On June 30, 2020, the trial court held the hearing on the fitness portion of the petition. The court took judicial notice that orders of adjudication and disposition were filed in this case on March 13, 2018, and on October 8, 2019, and the State filed a petition to terminate the respondent's parental rights.

¶ 39 Tiffany Yinger, a Caritas foster care case manager, testified that she was assigned to K.C. and C.C.'s case in August 2018. She was the second caseworker assigned to the case, as the children originally came into care on December 12, 2017. At the time of the hearing, K.C. was 15 years old and C.C. was 11 years old. The case came to DCFS on allegations of physical abuse, concerns with the respondent's mental health, and substance abuse. The family had a prior history with DCFS because C.C. was born "substance exposed." The first service plan in the current case was created in January 2018, and the most recent one was created on May 14, 2020. The first service plan's goals and tasks were to cooperate with the court system and DCFS and to participate in an integrated assessment.

19

¶ 40   The most recent service plan's goals and tasks were to cooperate with the court system and DCFS; participate in an integrated assessment; treatment for mental health and substance abuse and drops; complete a psychiatric evaluation; participate in individual therapy; complete parenting education; attend visitation; build healthy support systems; provide a safe and stable living environment; and complete domestic violence services. The respondent participated in a comprehensive mental health and substance abuse assessment with Centerstone in December 2017 and a renewed mental health assessment in October 2018.   After the first assessment, individual therapy was recommended.   In October 2018, the respondent was diagnosed with bipolar disorder with psychotic features, and individual therapy was recommended.   In February 2019, the respondent began treatment for her mental health issues, but her case was eventually closed due to her lack of communication or participation.   Prior to that, the respondent did not participate in individual therapy, or any other mental health treatment, despite it being a recommended service.   Yinger still had concerns about the respondent's mental health because the respondent never fully engaged in any type of mental health counseling.

¶ 41   The respondent was referred to Centerstone and TASC for substance abuse treatment.  The respondent attended the recommended treatment at Centerstone, although her attendance was inconsistent.  The respondent made no progress in her substance abuse treatment, and her case was eventually closed because of her lack of communication and failure to return for services.  She was also required to participate in drug drops but did not regularly attend; she missed 20 of her 52 drug drops.  Her last positive drop was for methamphetamine in December 2019.  She was referred to Centerstone for a psychiatric

20

evaluation, but no recommendations were made as the respondent refused to have her blood drawn and the evaluation was never completed. The respondent was referred to Refuge for parenting services, where she spent one year completing a 10-week course. In May 2018, the respondent was arrested during one of her visits with the children for possession of methamphetamine paraphernalia. She claimed that someone had put it in her bag, so the agency added the recommended task of building a support system because there was concern that the respondent did not consider the safety risks surrounding who she allowed around herself and the children; however, the respondent never developed a healthy support system.

¶ 42 Yinger was also concerned about the safety of the respondent's residence as there had been multiple robberies in the home, a reported sexual assault, an individual residing there who was stealing electricity from the neighbors, and multiple strangers that answered the door for home visits who had not passed background checks. Therefore, it was her opinion that it would not be safe for the children to return home. The respondent was also referred to Group Intervention for domestic violence services. She reported for an evaluation, but no recommendations were given as it was suspected that the respondent was either under the influence of a substance or severely mentally ill. She was informed that she could return for another evaluation after 6 months of sobriety but that she could not currently focus on a 26-week program. Overall, the respondent was uncooperative and avoided speaking with Yinger. She attempted several means of avoiding contact, including contacting other persons in the agency and Yinger's superiors.

21

¶ 43 Prior to Covid-19 restrictions taking effect, and after the permanency goal was changed to substitute care pending termination, the respondent was participating in two-hour supervised visits with the children once a month. Her last visit with them was January 2020. During the visits, Yinger observed that the respondent's relationship with the children was estranged because the children longed for the respondent's attention. It was Yinger's opinion that, because of the respondent's lack of progress towards the return home goal, and the fact that she failed to correct the conditions that caused the children to come into care, she should be found unfit by the court.

¶ 44 On cross-examination, Yinger acknowledged that she was aware that the respondent had issues with transportation; therefore, at the beginning of each month, she would give her a bus pass or gas card. Yinger acknowledged that the closest bus stop was several hours walk from the respondent's residence and that this may have affected her attendance for services. However, she also noted that the respondent never contacted med cab to inquire whether she qualified for transportation services. Additionally, the respondent's service providers reported that not only was her attendance sporadic, but that when she did attend, she was in a manic state and the counselors were unable to treat her for substance abuse issues because they were "too busy dealing with the crisis at hand for mental health." Additionally, the respondent was never clean from substances for four to six months, which was required to move forward in her services. The respondent reported on several occasions that her medications were causing false positives for methamphetamine, but samples that were sent off for further testing indicated that she did in fact have the substance in her system, and it was not a false positive. At this point in the hearing, the

22

trial court paused the proceedings and ordered the respondent, who was in the courtroom, to go with TASC for a drug drop. Questioning resumed 15 minutes later. It was Yinger's opinion that the respondent had not made this case a priority and that, though she made some effort in finding transportation, she had not completed services.

¶ 45    The respondent testified on her own behalf that she was not using amphetamines or methamphetamine and that her positive drug drops were caused by the medications she was taking (albuterol and ranitidine). She testified that an employee at Help at Home told her that these medications would in fact cause a false positive. She reported that she did an evaluation over the phone with the Maple Tree Clinic (Maple Tree) on May 13, 2020, as Covid-19 restrictions were in place. The evaluation indicated that she self-reported taking certain medications that she asserted caused the false positives in her drug screenings. With regards to transportation, she reported that she did not have a vehicle and that her primary method of transportation was walking. The walk from her residence to the nearest bus station was 30 miles, and it would take her four to six hours to walk that distance. Maple Street was closer as it was 8 to 12 miles from her residence, and it took her approximately two hours to walk that distance. She admitted that she had missed appointments but stated that she always rescheduled them within 24 hours. As a result of these long walks outdoors, she contracted double pneumonia, which she had been fighting for 12 months. It was her testimony that she did in fact meet with her TASC recovery coach on a monthly basis and that he was very considerate of her transportation issues and would often meet her at a closer location for her convenience. She attended Centerstone for mental health counseling, but there was a lapse in services when the counselor she was

23

seeing quit working there. She switched to Maple Street after a friend told her about it. It took her six months to get the evaluation because of Covid-19 restrictions, and even then, the evaluation was done over the phone. Currently, she was only being seen for mental health at Maple Street, as she was waiting for a cancellation, or for space to open up, for a substance abuse evaluation.

¶ 46    The respondent was informed by the children that Keith M. told them that they were not allowed to call her, or they would be punished. She reported that she had never missed any drug drops and that only three or four had to be rescheduled. As to her residence, she testified that she bought the house because she was told she needed some place livable for the children. None of the safety concerns referenced by Yinger were her fault as she was not involved in the crimes—they merely took place at her residence when she was not home. She believed she was being targeted because the house was large, and it was known that she was a woman living by herself at the residence. She had since installed cameras and replaced some of the older windows so they would lock properly.

¶ 47    The respondent opined that she did not need substance abuse treatment because she did not use illegal substances, as her drug drops reported false positives. She also did not think domestic violence services were necessary as the last incident where she was a victim of domestic violence was 10 to 12 years prior, at the hands of Vincent C., with whom she no longer had a relationship. Her only real obstacle to completing her tasks was her lack of transportation. She felt that she had made a maximum effort and satisfactory progress in her service plan and that the trial court should therefore not find her unfit.

¶ 48 Deborah Diehn testified on the respondent's behalf that she would, on occasion, give her rides to services but that the respondent did also walk great distances to report for appointments. Over the two years she had known the respondent, she witnessed a change in the respondent's behavior for the better. Specifically, the respondent was more stable and secure, clean and sober, kept a good house, and had been attending church with Diehn and her family.

¶ 49 After hearing arguments on the matter, the trial court noted that the respondent's drug drop from that day tested positive for marijuana, amphetamine, and methamphetamine. Also, the court did not give much weight to the assessment completed by Maple Street as there was no indication that the evaluator had reviewed any of the respondent's records, and the respondent did not self-report the same symptoms of depression that she testified to in court; therefore, the court questioned its accuracy. The court did not believe that the drug drops were reporting false positives because the hair follicle test, which was more accurate, also returned positive results indicating substance abuse. The court gave great weight to the follicle test results. Additionally, the respondent had a drug conviction in December 2019, and her child was born "substance dependent," but she had not completed any substance abuse services. The court found that the State proved by clear and convincing evidence that the respondent was an unfit person to have custody of K.C. and C.C. for the following reasons: (1) the respondent failed to make reasonable efforts to correct the conditions that were the basis for the children's removal during any nine-month period following adjudication, and (2) she failed to make

reasonable progress toward the return of the children during any nine-month period following adjudication.

¶ 50 On July 2, 2020, Caritas filed a permanency/best-interest report with the trial court. It restated the previous findings regarding the respondent's unsatisfactory progress. The report recommended termination of the respondent's parental rights, which would allow for permanency for the children through adoption.

¶ 51 The trial court held the hearing on the best-interest portion of the petition via Zoom. Yinger testified that K.C. and C.C. were currently placed together with their maternal uncle and had been in this placement since February 2019. The uncle's wife also resided there, and both adults, Keith and Kristie M., passed background checks. She observed the children in the placement. They each had their own room, they felt safe, they were bonded with Keith and Kristie M., the placement was consistent and stable, and the children were provided for. They were enrolled in school, and though K.C. struggled with Covid-19 restrictions, she was able to make up the schoolwork she missed. The children were also enrolled in extracurricular activities and had a friend group at school. Keith M. was employed with a union, and Kristie M. was a stay-at-home mother to the children. The children looked to them for support and to have their needs met. Keith and Kristie M. had signed permanency commitments and were willing to adopt the children. K.C. had some mental health issues that were being treated through counseling, including a history of self-harm. However, these issues were being addressed, and Yinger was not concerned with Keith and Kristie M.'s willingness or ability to address these issues. The children had two adult half-siblings, a maternal half-brother and a paternal half-sister, who had visited them

26

at Keith M.'s residence. Yinger reported that the respondent and her brother had a strained relationship, and he had safety concerns with allowing the respondent to visit with the children. It was her opinion that termination of the respondent's parental rights would not be detrimental to the minors because they had a stable placement that was consistent and safe. Furthermore, she opined that it would be in the best interests of the children that the respondent's parental rights be terminated, and they be made available for adoption.

¶ 52    The respondent testified that K.C. and C.C. loved her and wanted to be returned home to her. During her visits, she would bring activities to do with the children, and they were very affectionate with her. The visits always started and ended very emotionally with hugging and crying. Prior to the children being placed with her brother, the two had a good relationship. That relationship had since deteriorated, and the respondent and her brother's wife Kristie M. did not get along. The respondent tried to set up family counseling but could not get either Kristie M. or Yinger to set it up. She disagreed with Yinger and believed it would be detrimental to the children if her rights were terminated.

¶ 53    Lauren Reed, the children's guardian *ad litem* (GAL), testified that it was her opinion that, while the children did love their mother, they also longed for permanency. She opined that it was in the best interests of K.C. and C.C. that the respondent's parental rights be terminated. She iterated that the children had been very vocal with her that they wanted to be adopted for some finalization of this case. The best-interest factors she found most relevant or pertinent to her recommendation were the children's sense of permanency, their sense of home, who they went to for their daily needs, their sense of family, their

27

contacts in the community, their school contacts, and their overall well-being and safety in their current placement.

¶ 54    After hearing argument, the trial court made the following findings. Looking to the factors set forth in the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2018)), the court identified three factors that weighed heavily in favor of termination. First, it cited factor (a), the physical safety and welfare of the children including food, shelter, health, and clothing. *Id.* § 1-3(4.05)(a). The court noted the children were currently in a stable setting where all those needs were being met. Next, factor (c), the children's background and ties, weighed in favor of termination where the children currently had friends, family, and were enrolled in school. See *id.* § 1-3(4.05)(c). Most importantly, though, factor (g), the children's need for permanency, which included their need for stability and continuity of relationships with parental figures and sibling and other relatives, weighed the most in favor of termination. See *id.* § 1-3(4.05)(g). Therefore, the court ruled that based on the evidence presented, and the recommendation of the GAL, it was in the best interest and welfare of the children and the public that all parental rights and residual parental rights flowing to and through the respondent with respect to K.C. and C.C. be permanently terminated. The children were placed in the guardianship of DCFS, with the power to consent to adoption.

¶ 55    On July 2, 2020, the trial court entered a written order terminating the respondent's parental rights as to both K.C. and C.C. The court found by clear and convincing evidence that the respondent had failed to make reasonable efforts to correct the conditions that were the basis for the removal of the children during any nine-month period following the

28

adjudication of neglect or abuse, and that she failed to make reasonable progress towards the return home of the children during any nine-month period following the adjudication of neglect or abuse. Therefore, the court found the respondent unfit within the meaning of section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)).

¶ 56    As to the best-interest ruling, the trial court noted that the children had been placed in relative foster care since first coming into DCFS custody; that Keith and Kristie M., their foster parents at that time, wished to adopt K.C. and C.C. and had signed permanency commitments; that the children were strongly bonded to their foster parents; and that the children's emotional, psychological, and financial needs were being met. It found by a preponderance of the evidence that it was in the best interests of K.C. and C.C. that the respondent's parental rights be terminated. The court ordered the respondent's rights terminated and vested DCFS with the power to consent to adoption.

¶ 57    On July 21, 2020, a Caritas status report was filed with the trial court. It indicated that following the termination of the respondent's parental rights, Keith and Kristie M. requested that K.C. be removed from placement with them. She was moved to a fictive kin home and had remained in that placement since July 2020. C.C. remained in her placement with Keith and Kristie M., and they were being assisted in moving forward in the process of adopting C.C.

¶ 58    On August 3, 2020, the respondent filed a motion to reconsider the orders terminating her parental rights. She asserted that the trial court erred in finding her unfit. Specifically, she argued that she made a reasonable effort where she completed the majority of her service plan and complied to the best of her ability and knowledge, despite

transportation issues and financial hardship, and that the court failed to consider her evidence regarding her difficulties with transportation. Furthermore, she contended that the State failed to meet its burden of proof regarding her substance abuse and failed to prove that all service plan tasks were necessary to achieve the permanency goal and correct the conditions that brought the children into care. She also alleged that the court erred in finding it to be in the best interests of the children that her rights be terminated where the court failed to consider several factors that weighed in her favor and where upon information and belief the children wished to return home. Lastly, she argued that the State failed to meet its burden of proof and that it was not in the children's best interests that her rights be terminated.

¶ 59 On August 4, 2020, the trial court entered a subsequent permanency order establishing a permanency goal of adoption and the continued guardianship of DCFS over the children. On October 13, 2020, another Caritas status report was filed, which indicated that Keith and Kristie M. had made good progress and were still in the process of adopting C.C. The report also indicated that K.C. was still in placement with Amy O. (her fictive kin), who was willing to adopt her and had begun the process to do so. However, the six-month waiting period had not expired, and the adoption could not take place before then. Additionally, due to K.C.'s move, Vincent C.'s surrender of his parental rights was void, although he had not responded to contact attempts.

¶ 60 On October 29, 2020, the trial court entered an order denying the respondent's motion to reconsider. On November 18, 2020, a third Caritas status report was filed that indicated that both K.C.'s and C.C.'s adoptions had made progress in moving forward.

K.C. was still placed with Amy O., and C.C. was still placed with Keith and Kristie M. On November 30, 2020, the respondent filed a notice of appeal.

¶ 61                                    II. ANALYSIS

¶ 62    On appeal, the respondent first argues that the trial court erred in finding her unfit under section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)) where the State failed to prove her unfit by clear and convincing evidence. Next, she contends that the court's best-interest determination was against the manifest weight of the evidence.

¶ 63                           A. Fitness Determination

¶ 64    Proceedings for the termination of parental rights are governed by the Juvenile Court Act (705 ILCS 405/1-1 *et seq*. (West 2018)) and the Adoption Act (750 ILCS 50/0.01 *et seq*. (West 2018)). *In re D.F.*, 201 Ill. 2d 476, 494 (2002). A petition to terminate parental rights is filed under section 2-29 of the Juvenile Court Act. 705 ILCS 405/2-29(2) (West 2018). It delineates a two-step process for seeking termination of a parent's rights involuntarily. *Id*. The State must first establish, by clear and convincing evidence, that the parent is unfit under one or more of the grounds enumerated in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)). 705 ILCS 405/2-29(2), (4) (West 2018); *D.F.*, 201 Ill. 2d at 494-95. Because each of the statutory grounds of unfitness is independent, the trial court's finding may be affirmed where the evidence supports a finding of unfitness as to any one of the alleged grounds. *In re C.W.*, 199 Ill. 2d 198, 217 (2002).

¶ 65    Our courts have recognized that parental rights and responsibilities are of deep importance and should not be terminated lightly. *In re K.B.*, 314 Ill. App. 3d 739, 748 (2000). Thus, parental rights may be terminated only after a finding of unfitness that is

31

supported by clear and convincing evidence. *In re Gwynne P.*, 346 Ill. App. 3d 584, 590 (2004). A finding of unfitness will not be disturbed unless it is against the manifest weight of the evidence. *In re R.L.*, 352 Ill. App. 3d 985, 998 (2004). A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the determination is unreasonable, arbitrary, or not based on the evidence. *D.F.*, 201 Ill. 2d at 498. A trial court's finding of unfitness is given great deference as it has the best opportunity to view and evaluate the parties and their testimony. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006). A reviewing court, therefore, does not reweigh the evidence or reassess the credibility of the witnesses. *In re M.A.*, 325 Ill. App. 3d 387, 391 (2001).

¶ 66    Here, the trial court found the respondent unfit for the following reasons: (1) under section 1(D)(m)(i) of the Adoption Act (750 ILCS 50/1(D)(m)(i) (West 2018)), the respondent failed to make reasonable efforts to correct the conditions that were the basis for K.C. and C.C.'s removal during any nine-month period after the adjudication of neglect, specifically from March 13, 2018, to October 8, 2019; and (2) under section 1(D)(m)(ii) of the Adoption Act (*id.* § 1(D)(m)(ii)), she failed to make reasonable progress toward K.C. and C.C.'s return during any nine-month period after the adjudication of neglect, specifically from March 13, 2018, to October 8, 2019.

¶ 67    Reasonable efforts and reasonable progress are two distinct grounds of unfitness under section 1(D)(m). *Daphnie E.*, 368 Ill. App. 3d at 1066. Reasonable efforts relate to the goal of correcting the conditions that caused the removal of the children and are judged by a subjective standard based upon the amount of effort that is reasonable for that particular parent. *R.L.*, 352 Ill. App. 3d at 998. The trial court must determine whether the

parent has made earnest and conscientious strides toward correcting the conditions that led to the removal of the children from the home. *In re L.J.S.*, 2018 IL App (3d) 180218, ¶ 24.

¶ 68    In contrast, reasonable progress is judged using an objective standard that focuses on the steps the parent has taken toward the goal of reunification. *In re Jacorey S.*, 2012 IL App (1st) 113427, ¶ 21. The standard by which progress is measured is the parent's compliance with the trial court's directives and the service plans in light of the conditions that gave rise to removal and other conditions that later become known and would prevent the court from returning custody of the child to the parent. *Id.* "Reasonable progress exists when the trial court can conclude that it will be able to order the child returned to parental custody in the near future." *Daphnie E.*, 368 Ill. App. 3d at 1067.

¶ 69    In this case, the State identified March 13, 2018, the date of adjudication, to October 8, 2019, the filing date of the petition for termination, as the relevant time period. The trial court found that during this period, the respondent had failed to make reasonable efforts and reasonable progress.

¶ 70    The children were first brought into care due to an allegation of substantial risk of physical harm/environment injurious to the health and welfare by neglect and abuse. It was alleged that the respondent had a substance abuse addiction that impaired her ability to adequately care for the children; she did not have stable housing; she had a history of methamphetamine use, and the children had observed her hallucinating; she attempted to adulterate a drug test; she had mental health issues that were not being treated; K.C. reported the respondent hit her with a belt, leaving marks on her; she had a history with DCFS; and she had a criminal history.

33

¶ 71    Based on these allegations, a family service plan was prepared.  The service plan, discussed above, established which action steps and services the respondent would need to complete to correct the conditions that led to the removal of the children and work toward the goal of returning the children home.

¶ 72    The respondent argues that her inability to complete her services and tasks was the result of her lack of transportation.  When the case was originally opened, the respondent was living in Alton, and as such, that was the relevant geographical zone in which her referrals for services were made.  She later bought a house in Staunton and moved there on her own volition.  It was this move that created her transportation issues.  Though we agree with the respondent that transportation was a significant obstacle for her, and she did, on several occasions, walk for four to six hours to appointments, we do not find that this is dispositive.

¶ 73    The respondent's participation in services was inconsistent and sporadic during the entire relevant period.  She continued to test positive for methamphetamine throughout the life of the case.  When she did attend assessments or treatment appointments, she did not adequately engage and was usually in a manic state.  Her substance abuse counselors were unable to address and treat her addiction because they were forced to deal with the respondent's untreated mental health issues.  She refused to receive treatment for her history with domestic violence because she did not think it was necessary, though she testified that the children had witnessed the abuse.  She surrounded herself with unsafe people, eventually leading to her charge for possession of methamphetamine paraphernalia.  She did not begin mental health treatment until February 2019, and even then, she did not

complete those services. She did not complete any treatment programs for her substance abuse or her mental health issues. She never acknowledged how her actions resulted in the children being removed, and she denied that she had a substance abuse problem.

¶ 74 Based on these facts, as well as the other evidence presented at the fitness hearing discussed above, we agree with the trial court's finding that the State proved by clear and convincing evidence that the respondent was unfit in that she had not made reasonable efforts or progress during the relevant period following the adjudication of neglect.

¶ 75 B. The Best-Interest Determination

¶ 76 If the trial court finds that the parent is unfit, the matter proceeds to a second hearing, at which the State must prove that termination of parental rights is in the best interests of the child. 705 ILCS 405/2-29(2) (West 2018); *D.F.*, 201 Ill. 2d at 495. Following a finding of parental unfitness, the focus shifts entirely to the child. *In re D.T.*, 212 Ill. 2d 347, 364 (2004). At the best-interest stage, all considerations must yield to the best interest of the child, and the parent's interest in maintaining a parent-child relationship yields to the child's interest in a stable, loving home life. *Id.* At this point, the State must prove by a preponderance of the evidence that termination of parental rights is in the child's best interest. *Id*. at 366.

¶ 77 In reaching a best-interest determination, the trial court must consider, within the context of the child's age and developmental needs, the following factors: (1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural, and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive

35

placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child. *In re Dal. D.*, 2017 IL App (4th) 160893, ¶ 52; see also 705 ILCS 405/1-3(4.05) (West 2018).

¶ 78    Here, the trial court found that termination of the respondent's parental rights was in the best interests of K.C. and C.C. The respondent argues that this was against the manifest weight of the evidence where there was ample evidence that the children loved her and were affectionate with her and that termination of her rights would be detrimental to them as they may never be in contact with the respondent again.

¶ 79    In making its determination, the trial court noted that the issue to be determined was not whether the children loved the respondent, or shared a bond with her, but rather what placement would be best for them in the long term. At the time of the hearing, the children had been living with their aunt and uncle for just under a year and a half. The children had bonded with them, and all of their emotional, psychological, and financial needs were being met. Each child had their own room with their own bed and furniture. They were both receiving tutoring to help them with school. K.C. was being treated for her mental health issues and attending counseling. Both girls were enrolled in extracurricular activities and had made friends at school. Additionally, Keith and Kristie M. had expressed their desire to adopt the children and had signed permanency commitments.

¶ 80 The GAL also testified that it was her opinion that it was in the children's best interests that the respondent's parental rights be terminated. She noted that both girls had expressed to her that they loved the respondent. However, they were both very vocal about their desire to be adopted and have a final resolution of the case.

¶ 81 Based on the evidence presented, we find that the trial court's determination that termination was in the best interests of K.C. and C.C. was not against the manifest weight of the evidence.

¶ 82 Lastly, we note that the record indicates that the sisters are no longer placed together. As discussed above, Keith and Kristie M. signed a permanency commitment prior to the termination of the respondent's rights. Additionally, the children's father, Vincent C., relinquished his parental rights to both girls and signed his rights over to Keith and Kristie M. Sometime after the trial court terminated the respondent's parental rights, K.C. was removed from placement with Keith and Kristie M. at the foster parents' request. The record does not indicate why they requested she be removed, and further does not indicate why the sisters were separated, rather than rehomed together in an alternative placement. The record does not address whether Amy O., K.C.'s current foster mother, would be willing to adopt both sisters in order to keep them together. Though these considerations have no bearing on our decision with regards to the respondent, we note that it might have a bearing on the best-interest portion of the adoption proceedings.

¶ 83 Termination of the respondent's parental rights is not affected by the fact that Vincent C.'s irrevocable consent to adoption became void after K.C.'s removal from her placement with Keith and Kristie M. When the evidence supports a finding that one parent

is unfit, and it is in the best interests of the children to terminate that parent's parental rights, the trial court may enter that order, even if the other parent is not subject to a termination petition. *In re L.B.*, 2015 IL App (3d) 150023, ¶ 13. The fitness of the other parent is merely a factor that the court may consider at a best-interest hearing. *Id.* However, this court notes that this also does not require that the sisters be separated in their placement.

¶ 84                                       III. CONCLUSION

¶ 85    Based on the foregoing, we affirm the judgment of the circuit court of Madison County.


¶ 86    Affirmed.